United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

N.T.,

Plaintiff,

v.

SSA COMMISSIONER,

Defendant.

Case No. 25-cv-08810-EMC

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Docket Nos. 14, 15

## I. INTRODUCTION

Plaintiff N.T. seeks review of the Social Security Administration's final decision denying his applications for supplemental security income. N.T. seeks an order reversing the agency decision and remanding with instructions to award benefits, or alternatively, to remand for further administrative proceedings. The Social Security Commissioner opposes the motion.

For the reasons set forth below, the Court **GRANTS in part and DENIES in part** Plaintiff's motion for summary judgment, and **REMANDS** for further proceedings consistent with the Court's analysis.

## II. FACTS AND BACKGROUND

N.T. is 39 years old and resides in Oakland. He reports that his father was an alcoholic and physically abusive. AR 877. N.T. first became addicted to opioids at age 18 when he was prescribed oxycodone for an injury. AR 877, 986. In January 2015, N.T. suffered a gunshot wound to the chest and had surgery to remove the lower lobe and part of the middle lobe of his right lung. AR 813. On February 4, 2016, he was hospitalized with hand fractures, a stab wound, and head trauma after a beating. AR 516. On March 9, 2016, he was hospitalized and received staples in his scalp after being beaten. AR 492–93. In 2020, he crashed a vehicle while driving on

the freeway, hit his head on the steering wheel, and received staples in his scalp again. AR 823. During the same hospitalization in 2020, CT scans showed a bullet fragment in N.T.'s posterior chest wall and mild basilar atelectasis in the left lung (partial collapse of lower lung tissue). AR 831. He was unhoused after the shooting but has been in a permanent living situation since 2022 because his partner qualified for affordable housing. AR 985. N.T. reports that he has witnessed multiple people beaten to death and multiple deaths from overdoses. AR 878. Although he worked as a line cook for nine years, he has not engaged in substantial gainful activity since 2018. AR 67.

N.T. coordinated with the Homeless Action Center to obtain two consultative exams and apply for social security income. AR 876, 982.

In his disability claim filed on August 24, 2022, N.T. alleged physical and mental disability due to his gunshot wound, edema in both legs, dyspnea (shortness of breath) on exertion, Post-traumatic Stress Disorder ("PTSD"), anxiety, and depression. AR 79, 85. N.T.'s claim was initially denied on February 6, 2023, and again upon reconsideration on December 27, 2023. AR 115–16, 127–29.

In February of 2023, N.T. established care at LifeLong Trust, where Nurse Practitioner Jennifer Tsang ("NP Tsang") became his primary care provider. AR 339–40. In July of 2023, N.T. began seeing Associate Clinical Social Worker Samuel Kessel ("ASW Kessel") weekly for psychotherapy at LifeLong. AR 339. In April of 2024, NP Tsang referred N.T. for a psychiatric intake. AR 1420. He was diagnosed with PTSD and opioid use disorder by Psychiatric Nurse Practitioner Adebowale Adeniji and prescribed gabapentin and prazosin for his PTSD. AR 1417–18, 1423. But he did not begin taking the medications until shortly after his ALJ hearing on August 2, 2024. *See* AR 1466.

On August 2, 2024, Administrative Law Judge Debra Underwood ("ALJ") held a telephonic hearing on N.T.'s appeal of his claim denial. AR 35. N.T. appeared along with his counsel. AR 35–36. N.T. testified that his PTSD affects his sleep by causing him to experience nightmares that wake him up throughout the night and cause him to wake up aggravated in the mornings. AR 46. His condition leads him to avoid sleeping during PTSD episodes. *Id.* He also

United States District Court
Northern District of California

testified that he is untrusting of people and "jumpy" when out in public, especially in crowds, AR 47, and that he has a hard time finishing tasks and concentrating. AR 56.

N.T. explained that he walks his dog, does household chores by himself, goes grocery shopping when his partner cannot do so, and plays video games. AR 48–49. He testified that taking public transit is overwhelming for him because of the crowds. AR 57. He also clarified that he lost his most recent job as cook because he was unable to sleep, and was thus frequently late, absent, or too exhausted to be useful in the workplace. AR 53. N.T. also testified that he smokes fentanyl regularly and sometimes smokes meth, and that he did so while employed in the past. *Id*. He added that he was not using any drugs during his most recent job at a pizza restaurant because he was on Suboxone at that time. AR 55. N.T. was ultimately fired from the pizza restaurant because he was frequently late, absent, or too exhausted to be useful in the workplace due to his sleep problems. AR 53. He testified that being unhoused for many years was a barrier to getting medical treatment. AR 61.

At the hearing, N.T.'s counsel suggested that repeated head trauma in the years following his gunshot wound may have caused some of the symptoms N.T. experienced, such as trouble with concentration and focus, but there was no concrete evidence in the record linking N.T.'s head traumas to those symptoms. AR 62–65. Testing from multiple psychologists showed N.T. has moderate impairments in areas such as memory and processing speed, but none of the medical opinions opined on the cause of those limitations. *E.g.*, AR 881, 1473. None reported that the impairments were due to gunshot wounds. *See id.*

A vocational expert testified at the hearing. AR 35. The expert confirmed that N.T. had no relevant work history from the past five years because his last job ended in 2018. AR 67. The expert testified that someone with N.T.'s limitations could do unskilled jobs, for example as a hand packager or storage laborer. AR 68. The expert, however, also testified that off-task behavior 15% of the time or absence four days per month would preclude work in those positions. AR 69. He also testified that tardiness in the 90-day probationary period when starting a new job would lead to termination. AR 72. As will be discussed in further detail below, these limitations assumed by the expert were consistent with much of the medical opinion concerning N.T.'s

specific vocational limitations arising as a result of his health conditions.

On November 29, 2024, the ALJ issued a written decision, finding that N.T. was not disabled as defined by the Social Security Act. AR 14–27. The ALJ followed the five-step process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). As described below, the ALJ made certain findings as to each step. It should first be noted that in Steps One through Four, the claimant bears the burden of proving their disability. At Step Five, the burden shifts to the Commissioner to show that there are a "significant number of jobs in the national economy that [the] claimant can do."

***First,*** the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b); 416.920(b). The ALJ determined that N.T. has not engaged in substantial gainful activity since August 24, 2022, the application date. AR 19.

***Second,*** the ALJ determines whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that have lasted for at least 12 months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii), (c). The ALJ determined that N.T. had the following severe impairments: PTSD, major depressive disorder, and opioid use disorder. AR 19. The ALJ also found the following non-severe impairments: history of gunshot wound to the chest and dyspnea (shortness of breath) on exertion of unknown etiology with bilateral lower extremity edema. *Id*. Non-severe limitations, while not considered for Step Three, may factor into the residual functional capacity and are used to determine which jobs a claimant can perform under Steps Four and Five.

***Third,*** the ALJ determines whether the claimant's impairment or combination of impairments is severe enough to meet or equal the criteria of a listed impairment for the required duration, under Paragraph B or Paragraph C. *See* 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526; 416.920(d). The ALJ found that N.T.'s impairments did not meet the criteria of a listed impairment, so he was not found disabled at Step Three. AR 20. Specifically, as to Paragraph B, the ALJ found that N.T. exhibited only mild limitations with respect to understanding, remembering, or applying information, and in interacting with others. AR 20. The ALJ found moderate limitations with respect to concentrating, persisting, or maintaining pace, and adapting

United States District Court
Northern District of California

and self-management. *Id.* at 20–21. The ALJ concluded that N.T.'s mental impairments did not result in at least two "marked" limitations or one "extreme" limitation, which would be required to meet Paragraph B criteria. *Id.* at 21. As to Paragraph C, the ALJ found that N.T. did not meet the criteria because he had more than a "minimal capacity" to adapt to changes in his environment or new demands. AR 21.

***Fourth,*** if the criteria for a listed impairment are not met, the ALJ then determines the claimant's residual functional capacity ("RFC") and whether the claimant can still perform their past relevant work. A person's RFC is their ability to do physical and mental work activities on a sustained basis despite limitations related to their impairments. *See* 20 C.F.R. §§ 404.1520(e); 416.920(e). Work experience from more than five years ago is not considered relevant in a social security disability analysis. 20 C.F.R. § 416.960(b)(1). The ALJ found that N.T. had the RFC to perform a full range of work at all exertional levels with the following limitations: "the claimant can follow simple instructions; he can occasionally interact with coworkers, supervisors, and the general-public; he cannot perform fast-pace work . . . ; and he requires a work environment with few changes in routine." AR 21. The ALJ did not find that Plaintiff could not maintain a routine work schedule. The RFC was not utilized in Step Four because Plaintiff did not work in the past five years. The analysis then proceeded to Step Five.

***Finally,*** the ALJ must determine whether the claimant can do any jobs existing in significant numbers in the national economy based upon their RFC, age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(g); 416.920(g). If so, the claimant is not disabled, as defined in the Social Security Act. *Id.* If not, then the claimant is disabled. *Id.* Based on the testimony of the vocational expert, the ALJ found that N.T. could perform unskilled jobs, such as industrial cleaner or storage laborer, and was therefore not disabled. AR 26–27.

After Plaintiff was denied by the ALJ, he requested review by the Appeals Council. AR 7. The Appeals Council denied Plaintiff's request for review, stating:

> We found no reason under our rules to review the Administrative Law Judge's decision. **Therefore, we have denied your request for review**.
>
> **This means that the Administrative Law Judge's decision is the**

> **final decision of the Commissioner of Social Security in your case**.

AR 1 (emphases added).

On the appeal before this Court, Plaintiff contends that the ALJ's decision, which comprises "the final decision of the Commissioner of Social Security" in this case, was not supported by substantial evidence. Plaintiff's Brief (Dkt. 14) at 22–23; AR 1.

## III. LEGAL STANDARD

A claimant may seek a district court's judicial review after the Commissioner has reached a final decision on the claim. *See* 42 U.S.C. §405(g). Because the ALJ's decision "is the final decision of the Commissioner of Social Security," the Court focuses its inquiry on the ALJ's decision.

A district court may disturb this final decision "only if the ALJ has committed legal error or if the ALJ's findings are not supported by substantial evidence." *Pineda v. Berryhill*, 2019 WL 79030, at *2 (N.D. Cal. Jan. 2, 2019) (Chen, J.) (citing *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006)). Substantial evidence means "more than a mere scintilla, but less than a preponderance" of evidence that a reasonable mind may accept as adequate to support a conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). Should the evidence support "more than one rational interpretation," the Court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995)). In determining whether the ALJ's findings are supported by substantial evidence, the Court must weigh both the evidence that supports and the evidence that detracts from the ALJ's conclusion; it may not affirm by "isolating a specific quantum of supporting evidence." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). The Court may reverse an ALJ's decision if it finds non-harmless error. *See Stout*, 454 F.3d at 1055. An ALJ's error is harmless if it is inconsequential to the ultimate non-disability finding. *Id.*

## IV. DISCUSSION

Plaintiff contends that the ALJ erred in (1) finding his gunshot wound not severe at Step Two; (2) failing to develop the record by not ordering a neurological consultative examination; (3) improperly finding N.T. did not meet a listing at Step Three; (4) failing to provide clear,

United States District Court
Northern District of California

convincing, and well supported reasons to discount N.T.'s allegations of his symptoms; (5) failing to properly evaluate the medical opinion of each provider; and (6) calculating the RFC incorrectly.

A. Plaintiff's Gunshot Wound Was Not Severe

The Step Two inquiry to determine whether an impairment is severe is a "de minimis screening to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *Glanden v. Kijakazi*, 86 F.4th 838, 843–44 (9th Cir. 2023). The claimant bears the burden of proving that the impairment "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c).

Here, the ALJ declined to find the gunshot wound severe because there was no evidence of long-term or severe functional limitations arising from the injury. AR 20. The ALJ did not commit reversible error in doing so.

N.T. asserted that he experiences shortness of breath and that he can only climb about three flights of stairs or walk for 15 minutes before needing to rest. AR 1487. He testified that he still feels "sore" from the gunshot injury. AR 59. Yet N.T. reportedly rode his bicycle 90 minutes to get to an appointment on August 26, 2024, though he also told the evaluator at that appointment that it "took everything in me to get up here." AR 1466, 1468. The ALJ ordered a consultative exam with internal medicine physician Dr. Han, who did not find any physical limitations specifically related to the gunshot wound. AR 1480–85. Dr. Han found that N.T. had dyspnea on exertion, but he did not connect that condition to the gunshot wound. *Id.*

The ALJ also stated that there is no supportive medical evidence or "any indication that the claimant's remote gunshot wound causes any functional limits." AR 20. Dyspnea on exertion could be caused by other factors, such as Plaintiff's lack of physical activity.

N.T. did not receive any further medical care for his gunshot wound, other than one follow-up appointment to remove the stitches. AR 43–44. He testified that he did not seek treatment because he was homeless and moving around frequently. AR 44–45. Although N.T. had valid reasons not to seek treatment initially, he eventually connected to care at LifeLong and began treatment for his mental health in 2023. The fact that he did not also seek treatment from LifeLong at that time for any symptoms connected to his gunshot wound, such as dyspnea,

provides further evidence that the symptoms were not severe. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[F]ailure to seek treatment" may "cast doubt on the sincerity of claimant's pain testimony").

Based on the lack of evidence in the record about any residual impacts of N.T.'s gunshot wound or connection between his symptoms and the wound, it is reasonable to conclude — as the ALJ did — that the wound did not constitute a severe impairment. There is no concrete evidence confirming that N.T.'s dyspnea is tied to his gunshot injury. N.T. did not demonstrate any physical impairments connected to his gunshot wound, let alone one that would significantly limit his ability to do basic work activities. Accordingly, the ALJ's finding that any alleged impairment resulting from the gunshot wound was not severe was supported by substantial evidence.

B. The ALJ Did Not Fail to Develop the Record on Plaintiff's Neurological Impairments

The ALJ has a responsibility to develop a complete medical history for at least twelve months preceding the application. 20 C.F.R. § 404.1512(b)(1). They shall make every reasonable effort to get medical evidence from a plaintiff's medical sources. *Id.* A consultative examination may be ordered to "resolve an inconsistency, or when the evidence . . . is insufficient to . . . make a determination." 20 C.F.R. § 404.1519a(b).

However, an ALJ is required to develop the record "only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001). Where "the record is devoid of evidence to support a finding, . . . further development of the record, via consultation with a medical expert, is mandatory." *Ludwig v. Halter*, 5 F. App'x 689, 691 (9th Cir. 2001). On the other hand, the ALJ is not required to develop the record when there is "'a relatively complete medical chronology' of claimant's condition during the relevant time period." *Wellington v. Berryhill*, 878 F.3d 867, 874 (9th Cir. 2017) (quoting *Armstrong v. Comm'r of Social Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998)).

Here, the ALJ ordered both a mental and physical consultation to develop the record; the ALJ did not order a neurological exam. AR 74, 76. N.T. argues that the ALJ should have scheduled a neurological exam to assess his cognitive abilities after previous head traumas.

Plaintiff's Brief at 10. At the hearing, Plaintiff's counsel asked the ALJ to order a physical evaluation, but she did not mention a neurological evaluation, although she raised questions of whether Plaintiff's repeated head traumas caused some of his problems with concentration. AR 65, 74–76.

N.T. did not have a primary care provider for years, was unhoused, and received no follow up care for any of his hospitalizations except to get stitches removed, so there was no "ongoing medical chronology" of his neurological condition. AR 43–45. But neurological exam results were normal immediately following all three of his head injuries, implying that he was not concussed or otherwise neurologically impaired from the traumas. *See* AR 377, 402, 825.

Dr. Wiebe's mental tests found minor impairments in overall cognition. AR 880. She found mild impairment in attention/concentration and moderate impairment in memory. AR 881. ASW Kessel and NP Tsang documented issues with attention and concentration. AR 964. Dr. Catlin reported cognition, memory, and attention tests within normal ranges. AR 987. Dr. Mezzasalma, the most recent mental evaluator, found memory, attention, and judgment moderately impaired in her tests. AR 1468.

These multiple exams shed sufficient light on N.T.'s neurocognitive abilities for the ALJ to render a decision. The record in this regard was not "devoid of evidence," and thus the ALJ adequately performed her duty to develop the record by ordering two consultative exams to gain information, in addition to the other multiple medical opinions in the record, about N.T.'s limitations.

C. <u>Whether N.T. Meets the Criteria of a Listed Impairment</u>

If an impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1, the individual will be found disabled. 20 C.F.R. §§ 416.925–416.926. Limitations are evaluated on a five-point scale: none, mild, moderate, marked, and extreme. In order to meet a listing for mental disorders such as PTSD or depression, a claimant must prove either one extreme limitation or two marked limitations in the Paragraph B areas of mental functioning: (1) ability to understand, remember, or apply information; (2) ability to interact with others; (3) ability to concentrate, persist or maintain pace; and (4) ability to adapt or manage oneself. 20 C.F.R. § 404,

Subpt. P, App. 1 (12.00). If someone can exercise an area of mental functioning at home, the ALJ will not necessarily assume they can also use that area to function in a work setting where the demands are different. *Id.*

Alternatively, a mental disorder such as PTSD or depression could meet listing criteria under Paragraph C. *Id.* To qualify, the disorder must be "serious and persistent," meaning it was documented over at least two years. *Id.* Evidence must show that (1) the claimant relies on ongoing medical treatment to diminish the symptoms, and (2) the claimant has minimal capacity to adapt to changes in their environment or demands that are not already part of their daily life. *Id.* "If the evidence indicates that inconsistent treatment is a feature of [a claimant's] mental disorder, and it has led to an exacerbation of [their] symptoms . . . [the Social Security Administration] will not use it . . . to support a finding that [the claimant has] not received ongoing medical treatment." *Id.*

Here, the ALJ found that N.T. did not meet the criteria for listings 12.04 (depressive, bipolar, and related disorders) or 12.15 (trauma and stressor-related disorders) under Paragraph B or C. AR 20–21. The ALJ found only mild to moderate impairment in the four areas of mental functioning under Paragraph B, and at least two "marked" limitations would be required to meet Paragraph B criteria. Only ASW Kessel/NP Tsang plainly found enough impairment to meet a listing under Paragraph B. Dr. Catlin and Dr. Mezzasalma, to the contrary, did not. Dr. Wiebe's ratings are inconclusive. The levels of impairment documented by each evaluator are summarized below. *See* AR 20, 887–88, 965–66, 992–93, 1473.

ASW Kessel and NP Tsang saw Plaintiff most frequently and for the longest period as treating providers. They opined that N.T.'s symptoms did not improve with treatment, though he was not yet on medication for his PTSD at the time of the evaluation. Dr. Mezzasalma's exam was conducted a few weeks after N.T. was medicated, and it showed that he still experienced "significant flare ups of symptoms." AR 1476. But Dr. Mezzasalma found marked limitation only as to one category.

///

///

United States District Court
Northern District of California

| | Understand, remember, apply information | Interact with others | Concentrate, persist, maintain pace | Adapt or manage oneself |
|---|---|---|---|---|
| **Dr. Wiebe (consultative)** | Mild-moderate | Moderate-marked | Moderate-Marked | Moderate-Marked |
| **Dr. Catlin (consultative)** | Moderate | Moderate | Moderate | Moderate |
| **Dr. Mezzasalma (consultative)** | None | Moderate | Moderate | Marked |
| **ASW Kessel, NP Tsang (treating)** | Marked | Extreme | Marked | Marked |
| **Judge Underwood (ALJ)** | Mild | Mild | Moderate | Moderate |

///

Based upon the variety of opinions about how many "marked" or "extreme" limitations N.T. had, it was reasonable for the ALJ to conclude that he did not meet a listing under Paragraph B. One of the medical opinions suggested he met a listing, two did not, and one was unclear. The most recent evaluation from Dr. Mezzasalma, reflecting N.T.'s condition while in stable housing and on medication for his PTSD, identified only one marked limitation, providing substantial evidence that he would not meet a listing under Paragraph B. Although ASW Kessel and NP Tsang were treating providers who spent far more time with N.T., the ALJ was not specifically required to give more weight to their opinion than to Dr. Mezzasalma's under the updated regulations. 20 C.F.R. § 404.1520c(a). As licensed psychologists, Dr. Mezzasalma, Dr. Catlin, and Dr. Wiebe performed various cognitive tests to support their opinions that ASW Kessel and NP Tsang did not conduct. AR 880, 984, 1468. Dr. Mezzasalma, though not a treating provider, did meet N.T. in person. Her assessment was the most recent and performed after N.T. was on medication. In part due to the inconsistencies between the medical opinions at this step, the ALJ conclusion that N.T. did not meet the Paragraph B criteria was supported by substantial evidence.

The ALJ's reasoning with respect to Paragraph C presents a closer question. Most notably, the ALJ's findings conflict with portions of N.T.'s testimony and medical records, which demonstrate that he struggles to schedule and attend medical appointments, and he only regularly

leaves his home to go grocery shopping or walk his dog. AR 968, 984, 1467.

As to Paragraph C, the ALJ found that N.T. did not meet the criteria because he had more than a "minimal capacity" to adapt to changes to his environment or new demands. AR 21. N.T. testified that his PTSD disrupts his sleep, which causes difficulty concentrating and finishing tasks, and that he is always "jumpy" and "checking [his] shoulders," which also makes it hard to concentrate. AR 57. He testified that since his series of injuries, he struggles "a lot" with getting to appointments because he hasn't slept, loses track of days, or has trouble finding transportation, which was corroborated by ASW Kessel and NP Tsang's observation that he struggles to make and attend appointments. AR 57, 61, 968. As is discussed in the next section, the ALJ improperly discredited N.T.'s testimony about the severity of his symptoms related to PTSD and how they affect his ability to adapt to adapt to new demands and changes in his environment.

Cognitive testing from Dr. Wiebe and Dr. Mezzasalma (the oldest and most recent exams, respectively) showed he has moderate impairments in his memory and processing speed. AR 881, 1468, 1470. His scores on the Wechsler Memory Scale test, which indicates ability to remember information after a 20-30 minute delay, were mostly in the borderline range. AR 1471. He now relies on regular psychotherapy with ASW Kessel as well as gabapentin and prazosin to help manage his anxiety, nightmares, and sleep problems, yet still experiences "significant flare ups" of PTSD symptoms. AR 1476.

The ALJ emphasized that N.T. demonstrated an ability to get along well with medical providers, had appropriate grooming and hygiene, and often had normal mood and affect, indicating that he "possesses more than a minimal capacity to adapt to changes in his environment or to demands that are not already part of his normal life." AR 21. But one's ability to get along with a mental health provider over the phone or even in a quiet room does not necessarily translate to an ability to adapt to the types of changes and demands that would occur in a workplace, especially considering that these providers are trained to interact with those who suffer from mental disorders. The ALJ's findings did not acknowledge this distinction. And although N.T. can carry out tasks within the home such as personal hygiene and grooming, those are tasks that he performs every day in his normal life and are therefore not new demands. *See Gentry S. v.*

*Kijakazi*, 2022 WL 1601413, at *9 (N.D. Cal. Mar. 31, 2022) ("Being well-dressed and having Listing-level symptoms are not mutually exclusive).

Finally, the ALJ's apparent heavy reliance on the mental status exams ("MSEs") which showed normal mood and affect was misplaced. The MSEs took place during his regular therapy appointments and evaluations with consultative providers, the majority of which occurred over the phone from his own home. These types of interactions therefore did not evaluate the impacts from changes to his environment or require him to adapt to any demands as a workplace would.

Accordingly, the ALJ's finding that N.T. did not meet a listing under Paragraph C, based on the ALJ's errors in not crediting N.T.'s testimony and not affording proper weight to the medical evidence, was not supported by substantial evidence. However, as discussed below, the record on N.T.'s limitations and ability to work, particularly if he is treated and stabilized by appropriate medication over an extended period, appears incomplete. Thus, the Court cannot find as a matter of law that N.T. meets the Criteria of Paragraph C. This warrants remand for further proceedings to determine whether N.T. meets the Paragraph C criteria.

D. <u>The ALJ Erred in Determining Plaintiff's RFC at Step Four</u>

In determining the RFC, the ALJ considers medical opinions and Plaintiff's testimony to calculate the RFC. The ALJ found that N.T. had the RFC to perform a full range of work at all exertional levels with the following limitations: "the claimant can follow simple instructions; he can occasionally interact with coworkers, supervisors, and the general-public; he cannot perform fast-pace work . . . ; and he requires a work environment with few changes in routine." AR 21. The ALJ did not find N.T. could maintain compliance with a regular work schedule. By discrediting N.T.'s testimony about the severity of all of his symptoms, and in failing to properly assess the medical opinions from treating and examining providers which strongly suggested a number of limitations for which the ALJ did not account, the ALJ erred in assessing Mr. Temper's RFC. This error proximately affected the ALJ's findings at Step Five, where the burden shifts to the ALJ to show which jobs Plaintiff can perform based upon his RFC.

1. <u>The ALJ Improperly Discredited Plaintiff's Testimony</u>

To determine whether a claimant's testimony about their symptoms is credible, an ALJ

must engage in a two-step analysis. *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1035–36). First, she must determine if the claimant has "presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1035 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). If the claimant meets this first step, "and there is no evidence of malingering," the ALJ then proceeds to the second step and "may reject the claimant's testimony regarding the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* at 1036 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). In addition, the fact that a claimant "did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [a doctor's] assessment . . . is inaccurate." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996).

Here, the ALJ found that N.T.'s "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," AR 22, and she did not note any evidence of malingering. Thus, the ALJ was required to provide clear and convincing reasons to reject N.T.'s testimony about his symptoms. The ALJ did not satisfy this requirement.

N.T. testified about lack of sleep, nightmares, mistrust of others, anxiety, shortness of breath, difficulty concentrating, and issues in crowded places that preclude him from working. AR 46–47, 56–58. The ALJ discredited Plaintiff's testimony about the "intensity, persistence, and limiting effects" of his symptoms because: (1) he had not sought mental health treatment until July of 2023, (2) had not been prescribed psychiatric medication as of the hearing, and (3) could do activities of daily living ("ADLs") such as chores and dog care. AR 25. The ALJ also stated that the reports and findings in the record do not "support diminished abilities to the degree the claimant reported," although she did not specify which parts of the record. AR 26. These points were not clear and convincing reasons to reject N.T.'s testimony about his symptoms.

***First,*** as in *Nguyen*, the fact that N.T. took a long time to seek treatment for his PTSD

should not be held against him. 100 F.3d at 1465. There were numerous barriers to his treatment including housing instability, lack of transportation, mistrust of others, and the fear of reliving traumatic events through discussing them. Given N.T.'s circumstances, his failure to seek treatment does not constitute clear and convincing evidence that he did not experience the alleged limitations.

***Second,*** the ALJ was mistaken about N.T.'s medication status. The record shows that N.T. was already prescribed medications for psychiatric symptoms as of mid-2014, prior to the hearing, and he started taking them at his next psychiatric appointment after the hearing. AR 1350, 1466. N.T. takes gabapentin and prazosin, which have reportedly improved his PTSD symptoms, though Dr. Mezzasalma still found him to exhibit moderate and marked limitations despite the assistance of medication. AR 1473. The fact that it took N.T. a long time to start medication is not clear and convincing evidence that his symptoms were not limiting, particularly in light of the evidence that he still experienced limitations even after taking medication.

***Third,*** the ADLs described by N.T. are not inconsistent with his other testimony, and they are not a clear and convincing reason to reject his testimony about his mental health symptoms. Most of his ADLs take place inside the home, such as cooking, cleaning, and playing video games. These activities are not inconsistent with PTSD symptoms such as nightmares, sleep disruption, hypervigilance, or mistrust of others, since the ADLs can be done on his own schedule and pace at a time most convenient and conducive to him. Though he occasionally leaves the home to grocery shop or to walk his dog, N.T. testified that these activities are difficult for him: he only walks the dog on "better days," and only shops if his partner is unable to do so. AR 48, 1467. His ability to perform these ADLs appears to fluctuate based on how well he is coping with his symptoms. AR 1273, 1467. "[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

Both Dr. Catlin and ASW Kessel/NP Tsang opined that in a work environment, N.T. would be off task around 30% of the time and miss four or more days of work per month, which is

United States District Court
Northern District of California

consistent with his testimony that his capacity to work depends upon his fluctuating mental health symptoms. AR 967–68 (ASW Kessel/NP Tsang estimating that N.T. would be off task "[m]ore than 30%" of the time), 992–93 (Dr. Catlin report estimating that N.T. would be off ask "[a]pproximately 30%" of the time and that "multiple additional unplanned breaks would be required each day"). His ability to perform ADLs on an episodic basis does not gainsay the medical assessment of Dr. Catlin or ASW Kessel/NP Tsang. There is no other factual basis in the record to discredit N.T.

Considering the above, the ALJ did not provide clear and convincing reasons to discount N.T.'s testimony about the severity of his mental health symptoms. The ALJ's error infected her calculation of the RFC and thus her Step Five analysis of what jobs N.T. could perform.

2. <u>The ALJ Erred in Rejecting Medical Opinions</u>

As noted above, the ALJ considered medical opinion evidence to calculate the RFC, which was used in Step Five to determine what types of work Plaintiff can perform. AR 22–25. Errors in assessing the persuasiveness of medical opinions would therefore impact the finding of a disability at Step Five. In reaching her conclusions about N.T.'s RFC, the ALJ essentially rejected all or at least some parts of each of the four medical opinions. The ALJ's rejection of these opinions was not supported by substantial evidence.

The ALJ must consider five factors to assess the persuasiveness of a medical opinion: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other facts including but not limited to a medical source's familiarity with the other evidence in the claim or an understanding of the disability program's policies and evidentiary requirements. *See* 20 C.F.R. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5). Of these five, the ALJ must address supportability and consistency and may, but is not required to, explain how they considered the remaining three factors. *See* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Woods v. Kijakazi*, 32 F.4th 785, 791–92 (9th Cir. 2022); *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or

United States District Court
Northern District of California

her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Woods*, 32 F.4th at 792.

These regulations no longer require the ALJ to afford greater weight to the opinions of treating physicians. *See id.* at 787; *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources"). Instead, an ALJ may consider each medical opinion equally and may find an opinion more persuasive than others; in that regard, the opinions of a treating health professional who has seen the claimant repeatedly over some period of time and may be most familiar with the claimant may be worthy, as a practical matter, of particular weight under the five factors. In any event, the ALJ cannot reject a medical opinion as unsupported or inconsistent without an explanation supported by substantial evidence. *Woods*, 32 F.4th at 792.

Here, the ALJ incorrectly rejected each of the four medical opinions as unpersuasive or only partially persuasive. Some of the ALJ's main rationales for rejecting the medical evidence included that (1) there were inconsistencies between the medical opinions, (2) the severity of limitations was not supported by exam findings, test results, or MSEs, (3) the severity of limitations was in conflict with Plaintiff's ADLs, (4) Plaintiff's substance abuse was material to his abilities, and (5) Plaintiff had not sought treatment for his mental health until recently. The ALJ did not base these conclusions in substantial evidence and thus erred in rejecting the medical opinions of multiple providers who opined that N.T. had significant limitations which interfered with his ability to work.

a. The medical opinions were largely consistent

Despite differences in their findings about the Step Three criteria, all four doctors consistently concluded that N.T. would have problems maintaining a normal work schedule, and an inability to perform the jobs listed by the vocational expert at Step Five. They all diagnosed him with PTSD and depression, and they connected those disorders to symptoms such as disrupted

sleep. AR 884, 963, 989-90, 1465, 1472. ASW Kessel/NP Tsang and Dr. Catlin expressly opined that N.T. would miss four or more days of work per month and be off task approximately 30% of the time, a figure that would preclude employment per the vocational expert's opinion. AR 967-68, 993. Dr. Catlin added that "it is my assessment that he would miss significantly more than 4 days of [] work per month, even in a low stress job. This . . . is based on his significant past trauma and mental disorders, his frequent challenges in responding to others, and his history of not learning to self-manage his daily life." AR 993. Dr. Wiebe opined, in a manner consistent with ASW Kessel/NP Tsang and Dr. Catlin, that N.T. would have difficulty maintaining a regular work schedule due to his psychiatric, interpersonal, and cognitive functioning impairments. AR 884. Dr. Mezzasalma, who met N.T. in-person after he began taking psychiatric medication, also noted that N.T. still had a marked impairment in his "ability to adapt to the usual stresses and pressures common to a competitive work environment including completing a normal workday or workweek." AR 1473.

The medical opinions were also consistent with N.T.'s testimony. The ALJ found that ASW Kessel's and NP Tsang's "opinion is inconsistent with the record as a whole and the claimant's own testimony." But at the hearing, N.T. testified that lack of sleep and fatigue are the main reasons that he is unable to work. AR 25. Yet, the ALJ refused to recognize the connection between N.T.'s PTSD and sleep disruption, which was established by the record. In multiple questionnaires and exams, N.T. reported poor sleep *due to* nightmares about his traumatic events. *See, e.g.*, AR 46 (N.T. testifying that PTSD "affects [his] sleep monumentally" due to "extreme nightmares"), 931 (N.T. reporting "some sleep disruption" as a PTSD symptom during 2023 appointment with ASW Kessel), 990 (referring to insomnia and nightmares as a PTSD symptom), 1420 (psychiatric intake report noting PTSD and experience of nightmares and hypervigilance). Prescription notes from LifeLong specify gabapentin for "sleep and anxiety" and prazosin "to address nightmares." AR 1357. N.T.'s testimony was consistent with the medical opinion in terms of his fatigue and lack of sleep, but the ALJ's decision did not adequately address this evidence.

At Step Five, the ALJ must find that a claimant can perform specific jobs available in the

market. Yet all four medical providers, and N.T.'s own testimony, indicated that due to his disorders, N.T. would be unable to sustain a normal work schedule, precluding even the unskilled work described by the vocational expert.

b. <u>N.T.'s limitations were supported by exam findings</u>

The ALJ found that the medical opinions of all four providers were not supported by exam findings. The Commissioner's brief specifically noted that they were inconsistent with N.T.'s unremarkable mental status exams ("MSEs"). Comm'r Brief (Dkt. 15) at 3–4. ASW Kessel documented MSEs at each of his appointments with N.T., and the other providers also conducted MSEs during their evaluations. Many of the MSEs from this period do show normal affect, orientation, memory, appearance, perception, judgment and thought process, but ASW Kessel also frequently documented abnormal qualities such as slow, latent, or pressured speech and depressed, irritated, or anxious mood. *See* AR 912, 914, 1109, 1115, 1120, 1125, 1149. ASW Kessel sometimes noted restless motor activity and fleeting eye contact. AR 912, 978. Certain aspects of the MSEs were consistently normal, while others were not.

More broadly, the ALJ seemed to have expected a particular manifestation of PTSD, manifestations which do not reflect N.T.'s specific challenges. N.T.'s somewhat normal MSEs are not in fact inconsistent with his PTSD symptoms, which flare when triggered by factors like loud noises, crowds, sudden movements, or nightmares. AR 46, 47, 989, 1466. It is unsurprising that N.T. exhibited normal mental status for the most part when not actively experiencing a trigger, especially considering that a substantial number of his therapy appointments occurred over the phone from his home. *See, e.g.*, AR 1409, 1415, 1429, 1436, 1441 (appointments on 3/22/24, 3/29/24, 4/5/24, 5/16/24, 5/23/24). Taking into account N.T.'s specific diagnoses and the entire treatment record, the MSEs alone do not constitute substantial evidence to reject multiple medical opinions as unsupported, and the ALJ erred in placing undo weight on those exams.

The ALJ appears not to have adequately considered the rest of ASW Kessel's treatment records beyond the MSEs. Those records contain significant and probative evidence supportive of the providers' opinions about N.T.'s inability to work. ASW Kessel met with N.T. twenty-four times between July 2023 and May 2024, with a two-month gap from December to February. AR

1464. The treatment notes consistently address N.T.'s PTSD symptoms throughout that time. AR 912–29, 1397–1452. At his intake appointment, N.T.'s PTSD symptoms were described as "anxiety around others . . . intense dreams . . . fear of crowds . . . anticipat[ing] something negative or violent happening . . . sleep disruption . . . significant impairment of functioning, attention, socializing." AR 931. N.T.'s stated goal in therapy was to "reduce and manage PTSD symptoms." AR 1110. During therapy, ASW Kessel typically discussed coping strategies to manage N.T.'s PTSD symptoms such as cognitive defusion, Eye Movement Desensitization and Reprocessing, breath work, and meditation. *See* AR 921, 923, 925, 929. In later appointments in 2024, N.T. continued to report intense nightmares, disrupted sleep, and worsening PTSD symptoms. AR 1429, 1452. To be sure, at other appointments, N.T. was more stable and discussed goals such as exercising, but this simply underscored the fluctuating nature of his condition. AR 918, 1368. The fact that many of N.T.'s therapy appointments were entirely dedicated to discussing PTSD symptoms and ways to reduce them supports ASW Kessel's opinion about the persistent and significant nature of N.T.'s PTSD. The ALJ appears to have ignored the whole of the medical records and instead fixated on the MSEs. This was improper. *See William B. v. Saul*, 2020 WL 4318755, at *3 (E.D. Wash. July 27, 2020) ("Simply because Plaintiff did well on portions of the mental status exam does not negate the other abnormal findings, as well as [the doctor's] professional assessments."); *Kristine S.R. v. Saul,* 2020 WL 3578048, at *10 (C.D. Cal. June 30, 2020) ("While a conflict between treatment notes and a provider's opinion remains a legally sound reason to discount that opinion, in this case it was improper for the ALJ to rely on 'normal' or 'unremarkable' mental status examination findings when the treatment notes as a whole showed persistent symptoms — fluctuating between poorly and fairly controlled — related to plaintiff's severe impairments of schizoaffective disorder-bipolar type, and PTSD.") (citing *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)).

The consultative medical opinions about N.T.'s limitations which interfered with his ability to hold a job were supported by other evidence including cognitive testing, the PTSD checklist from the DSM-5, Beck Inventory tests for anxiety and depression, and clinical interviews. *E.g.*, AR 880, 984, 1468. Some of the assessments were partially based on N.T.'s

self-reported symptoms at the appointments, which the ALJ erred in discrediting as addressed above. Mental health disorders, by nature, do not always present outwardly during an examination, and mental health providers may therefore properly rely in part on patient self-reports for diagnosis — something the ALJ appeared not to have fully appreciated. *See Martinez v. Saul*, 859 F. App'x 142, 144 (9th Cir. 2021) (mem.) ("We have explained that psychiatric diagnoses 'will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient.'") (quoting *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017)). ASW Kessel/NP Tsang, Dr. Wiebe, Dr. Catlin, and Dr. Mezzasalma all found symptoms from the PTSD checklist in the DSM-5. AR 884–85, 963, 988, 1472. Dr. Wiebe and Dr. Catlin diagnosed N.T. with depression based on the Beck Inventory tests. AR 881–82, 987. These findings, based on both tests and clinical interviews, provide further support to the opinions about N.T.'s inability to work.

In conclusion, the medical opinions about N.T.'s limitations, which interfered with his ability to work on a consistent and reliable basis, were supported by a combination of test results and communications with N.T. and were not contradicted by his MSEs.

c. <u>N.T.'s ADLs were consistent with his limitations</u>

The ALJ asserted that N.T.'s ADLs were inconsistent with the limitations described by the medical providers. The record indicates that N.T. can perform ADLs such as household chores, grocery shopping, playing video games, and walking his dog. He testified that he sometimes comes back from walks "quite irritated and upset . . . breathing heavily from the physical exertion and from anxiety." AR 50. But as noted above, his ability to perform ADLs on his own schedule, often from home, says little about his ability to conform to a work environment. Many of his other activities occur sporadically in and around the home, and his ability to perform them fluctuates based on his symptoms. Household chores, grooming, pet care, and "occasional shopping outside the home" are not necessarily transferable to a work environment where it may be impossible to take breaks or where certain stressors exist that are not present in the home. *See Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017) ("[E]ven though Diedrich was performing these tasks, she was likely not doing them with the consistency and persistence that a work

environment requires. . . . Diedrich's symptoms also included anxiety related to social interactions, making a task easy to perform inside the home potentially very difficult to perform outside the home."). And the ability to complete tasks within and around the home does not preclude a finding of an extreme limitation in interacting with others at work, as the ADLs that Plaintiff engages in do not require interactions with others. Thus, N.T.'s ADLs are not inconsistent with the limitations that each medical provider documented. As made clear by the Ninth Circuit, one need not "vegetate in a dark room" to qualify as disabled. *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (quoting *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981)).

Considering the case law and limited ADLs described by N.T. and his medical providers, the ALJ did not provide clear and convincing reasons to discount N.T.'s testimony, and the ALJ's finding that the medical opinions were not supported by treatment records was itself not supported by substantial evidence.

d. Plaintiff's substance abuse was immaterial to his disability

The ALJ questioned several of the medical opinions because they did not sufficiently account for N.T.'s substance abuse; the ALJ believed the medical examiners failed to explain why N.T.'s substance abuse was immaterial to his disability-related symptoms which interfered with his ability to work. But the record shows that N.T.'s substance abuse was not material to the diagnosis of PTSD, his limitations, or his ability to work. At the hearing, N.T. estimated that he was sober throughout his last job at a pizza restaurant, roughly spanning seven to nine months in 2018. AR 55–56. His PTSD symptoms persisted during that time, ultimately causing his termination because he was frequently absent or exhausted. *Id.* In addition, N.T. was first addicted to opioids at age eighteen after they were prescribed for an injury, and he worked for nine years while using drugs before he was shot. AR 53, 986. At the time of his appointment with Dr. Catlin, N.T. was not using drugs, though he relapsed soon after. AR 51. The fact that Dr. Catlin believed N.T. was no longer suffering from a substance abuse disorder, yet still opined that he would be off-task more than 30% of the time and miss more than four days of work per month, supports her conclusion that he would be unable to hold a regular job even in the absence of drug use. Dr. Wiebe opined that N.T. would have difficulty maintaining a regular job even if he were

to never use substances in the future. AR 885. ASW Kessel and NP Tsang opined that N.T.'s impairments would not significantly improve in the absence of substance use. AR 967.

The record is replete with medical opinions explaining that N.T.'s PTSD symptoms persist even in the absence of substance abuse, and that his substance use is not a material factor in his inability to work. Any finding by the ALJ to the contrary was not supported by substantial evidence.

e. <u>Plaintiff's failure to seek treatment cannot be held against him</u>

Finally, the ALJ emphasized that N.T. had not sought treatment for his mental health until recently. The fact that N.T. took a long time to seek treatment for his PTSD cannot be used as a basis to find medical opinions unpersuasive. *Nguyen*, 100 F.3d at 1465 (the fact that a claimant "did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [a doctor's] assessment . . . is inaccurate."). There were numerous credible barriers to his treatment including housing instability, lack of transportation, mistrust of others, and the fear of reliving traumatic events through discussing them. As N.T. said, "my PTSD has been my biggest obstacle to getting into treatment for my PTSD because talking about it can make me relive it." AR 1465. The ALJ failed to explain why the delay should have impacted the medical providers' credibility in their assessment of N.T.

Given N.T.'s circumstances, his failure to seek treatment does not constitute clear and convincing evidence that he did not experience the alleged limitations.

* * *

For the foregoing reasons, the ALJ's rejection of the medical providers' opinions was not supported by substantial evidence and constituted error. These errors infected the ALJ's calculation of the RFC, resulting in further errors in determining what jobs Plaintiff can perform based upon his limitations. The ALJ expressly found that "considering [Plaintiff's] age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR 27. But given the significant convergence of medical opinions determining that N.T. would be absent, tardy, or off-task a significant portion of the workday, the ALJ's determination that

Plaintiff is "not disabled" must be reconsidered in light of the above analysis. *See id.* To reiterate, ASW Kessel/NP Tsang and Dr. Catlin opined that N.T. would be off task more than 30% of the time and miss four or more days of work per month. Dr. Wiebe and Dr. Mezzasalma also agreed that N.T. would have difficulty maintaining a regular work schedule. All four medical opinions are consistent with each other and with N.T.'s testimony on this point. The vocational expert testified that off-task behavior 15% of the time or absence four days per month would preclude work in unskilled positions. AR 69. In addition, the vocational expert testified that any tardiness in the 90-day probationary period when starting a new job would lead to termination. AR 72. Thus, if the ALJ had properly credited the medical opinions and N.T.'s testimony, the ALJ could likely have found N.T. disabled at Step Five.

## V. <u>REMAND FOR FURTHER PROCEEDINGS</u>

N.T. requests that the Court grant summary judgment in his favor and remand for immediate payment of benefits, or in the alternative, to remand for further administrative proceedings. Plaintiff's Brief at 24–25.

"[W]hen 'the record before the agency does not support the agency action, . . . the agency has not considered all relevant factors, or . . . the reviewing court simply cannot evaluate the challenged agency action on the basis before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Further proceedings are "generally useful" where "there is a need to resolve conflicts and ambiguities." *Id.* at 1101. The Court may order an immediate award of benefits only if: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). "[A] reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony." *Dominguez v. Colvin*, 808 F.3d 403, 408

(9th Cir. 2016). Where "an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency." *Treichler*, 775 F.3d at 1105.

Here, the ALJ erred in: (1) finding that Plaintiff, on the record then before the ALJ, did not satisfy the Paragraph C criteria at Step Three, (2) discrediting Plaintiff's testimony, and (3) finding the medical opinions unpersuasive. These errors infected the ALJ's determination of Plaintiff's RFC, in turn affecting the ALJ's findings with respect to N.T.'s ability to be employed. These errors are not harmless. *See Treichler*, 775 F.3d at 1099 ("[A]n error is harmless if it is 'inconsequential to the ultimate nondisability determination.'") (quoting *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)); *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) (stating that court "cautious about when harmless error should be found").

The conditions for immediate award of benefits, however, are not satisfied here. Further proceedings consistent with this opinion will allow the ALJ to resolve ambiguities in the record, specifically those concerning how N.T.'s recent medical treatment for PTSD affects his symptoms, such as sleep disruption and problems interacting with others, and how any potential improvements in symptoms impact his ability to be employed. Accordingly, reconsideration in light of this Order and possible further development of the record in relation to the impacts of N.T.'s recent use of psychiatric medications is warranted.

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Plaintiff's motion for summary judgment, and **REMANDS** for further proceedings consistent with the Court's analysis.

**IT IS SO ORDERED**.

Dated: August 24, 2026

EDWARD M. CHEN
United States District Judge